765 So.2d 185 (2000)
Nasser David GHELICHKHANI, Appellant,
v.
STATE of Florida, Appellee.
No. 4D99-1710.
District Court of Appeal of Florida, Fourth District.
July 19, 2000.
Rehearing Denied September 6, 2000.
*186 Richard L. Jorandby, Public Defender, and Allen J. DeWeese, Assistant Public Defender, West Palm Beach, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Don M. Rogers, Assistant Attorney General, West Palm Beach, for appellee.
STEVENSON, J.
Nasser David Ghelichkhani was tried by jury and convicted of lewd assault on a two and a half year old child. At trial, the State was permitted to introduce the hearsay statements of the child victim, K.L., which identify Ghelichkhani as "the guy who touched my pee-pee." Appellant contends that the trial court abused its discretion in allowing these hearsay statements into evidence, challenging the trial judge's findings that K.L.'s hearsay statements are reliable and that there was "other corroborative evidence of the abuse or offense," both of which are prerequisites to admissibility. We find merit in Ghelichkhani's claim that there was no other corroborative evidence of the abuse or offense and reverse.

Admissibility of Child Victim Hearsay
Florida's Evidence Code permits the hearsay statements of a child who is the victim of sexual abuse to be introduced into evidence provided that certain criteria are met. Specifically, section 90.803(23), Florida Statutes (Supp.1998), provides that such statements are admissible when (1) the statements are made by a child "with a physical, mental, emotional, or developmental age of 11 or less"; (2) the statements "describ[e] ... any offense involving an unlawful sexual act ... performed in the presence of, with, by, or on the declarant child"; (3) the court finds, after conducting a hearing, that "the time, content, and circumstances of the statement provide sufficient safeguards of reliability" after considering factors such as "the mental and physical age of the child and maturity of the child, the nature and duration of the abuse or offense, the relationship of the child to the offender, the reliability of the assertion, the reliability of the child victim" and any other appropriate factors; and (4) the child either testifies or, if the child is unavailable as a witness, "there is *187 other corroborative evidence of the abuse or offense."

The Hearing in the Instant Case
In the instant case, the trial judge conducted the hearing contemplated by subsection (23)(a)1 of the statute. At the hearing, the State sought to have the trial judge find that K.L. was unavailable as a witness at trial. To that end, the State presented the testimony of Dr. Rahaim, a psychologist. Dr. Rahaim testified that he had spent two to two and a half hours with K.L. and opined that she could not perform as a witness at trial. According to Dr. Rahaim, while K.L. could accurately recount events and things that happened to her at or near the time of the event, in a small child, as time passes, memories fade. In addition, Dr. Rahaim stated that K.L. would not be competent as a witness at trial because she simply did not understand the obligation to tell the truth. Ghelichkhani put on no evidence to the contrary and the judge found K.L. unavailable as a witness at trial. As a result of this finding, in addition to proving that the statements were reliable, the State was required to establish that there was "other corroborative evidence of the abuse or offense." § 90.803(23)(a)2.b.
K.L.'s seven-year-old brother Eric was asked to recount the interaction that he and his sister had with the defendant. Eric explained that, last summer, he and his family were in West Palm Beach to attend a wedding and that they stayed at a hotel. According to Eric, when they got back to the hotel after the wedding, his mom was lying down and asked him to go to the front desk to get more pillows. Eric and his sister, K.L., went to the front desk. Eric testified that the man at the front desk, later identified as Ghelichkhani, took him and his sister upstairs to show them where the pillows were. Eric explained that they took the elevator upstairs and that the man picked up his sister when they got on the elevator. When they got off the elevator, they went to a nearby room and the man opened the door with a key. Eric testified that the man went into the room, brought out two pillows and two pillow cases, handed them to him, and asked if he knew how to put the cases on. Then, he asked Eric if he wanted some gummy worms. Eric testified that he said "no, thank you," but that his sister replied that she wanted some.
Next, according to Eric, the man took his sister by the hand and led her into the supply room. Eric testified that the door shut behind them. While they were in the room, he was putting on the pillow cases. Eric testified that he began banging on the door, but that no one answered, and when he tried to turn the knob, it was locked. The man and his sister then came out of the room and, according to Eric, the man was holding his sister's hand. His sister had gummy worms. The trio then rode the elevator back downstairs. Eric testified that when they got off the elevator, his mom and dad were waiting for them. According to Eric, when they were back in their room, he heard his sister say "that man touched my pee-pee."
Jacqueline Leeks, the children's mother, confirmed that she asked her son, Eric, to go to the front desk and get two more pillows, explaining that the front desk was close enough to their room that she believed that she would hear the children if they were in trouble and that the kids were familiar with the front desk because they had spent time at the play-area there. During the children's absence, her husband returned to the room and inquired about the children's whereabouts. When her husband indicated that he had not seen the children in the lobby, they went down to look for them. While they were in the lobby, the elevator opened; Eric and K.L. were on the elevator with the defendant. According to Mrs. Leeks, 5-7 minutes had passed from the time the children left the room until she saw them on the elevator. When the kids got off the elevator, Eric was holding the pillows and K.L. had candy.
*188 According to Mrs. Leeks, when they returned to their room, Eric went into one room to put the pillows on the bed and she and K.L. went into another. Then, K.L. stated, "mommy, that man touched my pee-pee. When we went upstairs, that man touched my pee-pee." According to Mrs. Leeks, K.L. simply volunteered these statements. Mrs. Leeks took K.L. into the bathroom, but found no bleeding, scratches or marks. She asked her daughter if she was sure and K.L. responded, "yes, he touched my pee-pee" and demonstrated by putting her hand inside her panties. Mrs. Leeks asserted that the statements from her daughter came less than two minutes after she got off the elevator with the defendant.
Mrs. Leeks then testified that when her husband, who had been carrying luggage to the car, returned to the room, K.L. ran up to him and said "daddy, that man touched my pee-pee." The couple had the children show them the room and, according to Mrs. Leeks, as they got off the elevator, K.L. pointed at the door and said that she was in that room and "that's the room right there where that man touched my pee-pee." Mrs. Leeks testified that her husband went into a rage and confronted the defendant, ordering him to call 911. When it appeared that the defendant had called information, Michael Leeks called 911 himself. Mrs. Leeks testified that when her husband asked the defendant if he touched his daughter, the man shook his head no. While the police were on the way, the defendant went into the bathroom. Mrs. Leeks testified that she heard the water running in the sink for two to three minutes, but did not hear a toilet flush. K.L.'s father, Michael Leeks', testimony was similar to his wife's.
The police arrived at 11:55 p.m., some ten minutes or so after the 911 call. Officer Jackson testified that he spoke with both parents and had the opportunity to speak with K.L., some ten to fifteen minutes after his arrival. According to Jackson, K.L. did not seem frightened or upset and she communicated well, telling him her age, her name, and that the man in the hotel "touched my pee-pee." When she made this statement, K.L. demonstrated, pulling out the waistband of her panties and placing her right hand inside her panties in a cupped fashion. At that time, K.L. did not indicate where in the hotel this had happened. K.L.'s mother was present when Officer Jackson spoke with K.L. but, according to the officer, did not interfere. Officer Jackson testified that he asked K.L. whether she could show him the man. According to him, K.L. walked from the "conference area" where she and her family were located and to the front desk, pointing up at the desk and stating "that man." Officer Jackson identified the defendant as the man that K.L. had pointed to. On cross examination, however, defense counsel established that some of the details that Eric gave the officer did not match his testimony at the hearing. For instance, according to the officer, when he spoke to Eric that night, Eric indicated that the defendant carried K.L. while on the elevator and continued to hold K.L. while he walked into the supply room. Eric did not tell the officer that he banged on the door.
Finally, Officer Jackson testified that he spoke to the defendant. According to Jackson, Ghelichkhani admitted that the children came to the lobby, asking for extra pillows. Ghelichkhani acknowledged that he and the children went upstairs to the supply room. He stated, however, that he opened the door and then put a box of brochures in front of the door, which closed automatically, to prop it open. Ghelichkhani explained that he went into the room to retrieve the pillows and that the children remained outside. He stated that he put the pillows on the floor and asked the boy if he knew how to put the cases on. Then, he asked the children if they wanted candy. Officer Jackson testified that Ghelichkhani indicated that the children responded "yes" and that he went back inside to retrieve it. As he did, the *189 girl ran into the room, knocking the box away from the door, causing it to shut. Officer Jackson testified that Ghelichkhani indicated that he grabbed the candy, grabbed the little girl's hand, walked outside and gave the candy to the kids.
Detective Noel, a member of the crimes against children unit, came to the hotel the next day and took taped statements from the children. Detective Noel testified that when he spoke with K.L., she was in the living area of the hotel suite, accompanied by her mother. According to Noel, he did not initially intend to tape K.L. due to her young age; however, after meeting with K.L., the detective determined that she was articulate enough to give a taped statement. K.L.'s taped statement was played for the trial judge. First, the detective questioned K.L. about her age, her birthday, the name of her school, the name of her teachers, and sought to establish whether K.L. could identify colors. K.L. articulated that she had been to a church the day before and that Daddy was "standing up there" and she was with mommy. The detective then turned to the issue of the abuse.
Noel: Now, did you talk to a policeman last night, a man in a police uniform with a badge, did you talk to a man?
K.L.: Mm-mm.
Noel: Okay. What did you tell him, what did you talk to him about?
K.L.: I talk to him about the guy.
Noel: About the guy?
K.L.: About the guy that touched my pee-pee.
Noel: He touched your pee-pee, okay, you pointed down between your legs, okay. And you showed the man to him, you pointed at him, you said, that's the man? Yeah, that was good, you did a good job. Okay. Did the man say anything when he touched your pee-pee?
K.L.: He was in the room and he gave me some candy.
Noel: He was in the room and he gave you some candy, okay. But did he say anything?
K.L.: Huh?
Noel: Did the man say anything to you?
K.L.: Yes.
Noel: What did he say?
Mom: Do you know? If you don't know, you can tell him.
Noel: Yeah, it's okay not to know or not to remember, okay. Did the man hurt you?
K.L.: Uh-uh.
Noel: No, okay, well, that's good. But you said he touched your pee-pee. What did he touch your pee-pee with?
K.L.: In that room.
Noel: Okay, it was in the room, but what did he touch it with, did he touch it with his ear?
K.L.: No.
Noel: With what?
K.L.: With his hand.
Noel: Okay, with his hand, okay. With his whole hand or with a finger?
K.L.: With his whole hand.
Noel: Did you have to do anything, did he have you touch him?
K.L.: Uh-uh.
Noel: No, okay, well, that's good. When
K.L.: He touched the whole button.
Noel: He touched the what?
K.L.: The whole button.
Mom: Where were the buttons at?
K.L.: On my panties.
Mom: Where? What buttons are you talking about?
K.L.: When he was in the room.
Mom: Mm-mm.
K.L.: (unintelligible)
Mom: Right.
K.L.: He touched my pee-pee.

*190 Mom: Mm-mm.
K.L.: He talked to me.
Mom: He talked to you?
K.L.: Yeah.
Mom: Where was your brother?
K.L.: It was my birthday, too.
Mom: It was not your birthday. Where was Eric?
K.L.: He was putting pillowcases on.
Mom: He was putting pillowcases on.
Noel: Okay. When the man touched you on your pee-pee, was it outside or inside your panties?
K.L.: Inside my panties.
Noel: Inside your panties, okay. Did he touch you anywhere else?
K.L.: No.
Noel: Okay, well, that's good. Okay. Then when he touched your pee-pee, did he touch on the outside of your pee-pee or on the inside of your pee-pee?
K.L.: Inside my pee-pee.
Noel: Inside your pee-pee. What went inside your pee-pee?
K.L.: When he was in the room.
Noel: When he was in the room, okay. Is there anything else that she can basically comment about?
Mom: She said he opened her panties. Can you show him how he opened your panties?
Noel: Where did he go into your panties from?
K.L.: All the way.
Noel: Okay, you are pulling the waistband open, okay, that's fine. Okay, well, I thank you for talking to me, you did a good job.
At the conclusion of the hearing, the trial judge found (1) that K.L.'s hearsay statements were reliable and (2) that there was sufficient "other corroborative evidence of the abuse or offense" and ruled that K.L.'s hearsay statements were admissible at trial under the child victim hearsay exception, section 90.803(23).

Reliability
The procedure that trial judges are to use in applying section 90.803(23) has been set forth by the supreme court as follows:
First, the trial judge must determine whether the hearsay statement is reliable and from a trustworthy source without regard to corroborating evidence. If the answer is yes, then the trial judge must determine whether other corroborating evidence is present. If the answer to either question is no, then the hearsay statements are inadmissible.
State v. Townsend, 635 So.2d 949, 957 (Fla.1994). We begin by stating that we have no quarrel with the trial judge's finding of reliability. Rather, our concern is with the trial court's determination that there was "other corroborative evidence of the abuse or offense."

"Other Corroborative Evidence of the Abuse or Offense"
"Essentially, the other corroborating evidence requirement assures that a defendant will not be convicted solely on the basis of the hearsay testimony." Townsend, 635 So.2d at 957. The phrase "other corroborative evidence of the abuse or offense" has been defined as "evidence other than the alleged child victim's out-of-court statements which tends to confirm that the charged offense occurred." Jones v. State, 728 So.2d 788, 791 (Fla. 1st DCA 1999). And, while it is clear that the child victim's hearsay statements may not be the other corroborative evidence, there is relatively little case law addressing the nature of evidence that will be deemed sufficient.
Not surprisingly, the courts have consistently held that physical evidence that a child has been abused is sufficient "other corroborative evidence of the abuse or offense." See, e.g., Zmijewski v. B'Nai Torah Congregation of Boca Raton, Inc., 639 So.2d 1022 (Fla. 4th DCA 1994); Clay v. State, 580 So.2d 843 (Fla. 1st DCA *191 1991). And, a defendant's admission to the offense or admission that he could have accidentally touched the child in an inappropriate manner have been held to be sufficient "other corroborative evidence of the abuse or offense." For instance, in Delacruz v. State, 734 So.2d 1116, 1122 (Fla. 1st DCA 1999), the issue was whether the defendant's statement that "he could have accidentally touched the child's vagina `a lot of times' while playing with her," made following his arrest, could be considered as "other corroborative evidence of the abuse or offense." The First District concluded that it could. Despite the court's holding, however, Delacruz' conviction was reversed as the trial court had relied upon both Delacruz' statement and a hearsay statement of the child victim, which may not be used as other corroborative evidence, and the panel could not determine whether the trial judge would have found sufficient corroboration to admit the hearsay had he considered only Delacruz's statement.
Even where a defendant expressly denies any improper touching, his statements can provide sufficient "other corroborative evidence of the abuse or offense" where they supply enough inculpating details concerning the alleged sexual offense. In Reyner v. State, 745 So.2d 1071 (Fla. 1st DCA 1999), the defendant was charged with lewd assault upon his four-year-old niece. The incident occurred while Reyner's wife was babysitting the child. Pursuant to section 90.803(23), the State sought to introduce the father's testimony that his daughter told him that "while Reyner and the child were sharing a bed at `nap time,' Reyner put her on his chest, placed his penis between her legs, and moved her back and forth, and `wet stuff came out of his penis." 745 So.2d at 1072. As "other corroborative evidence of the abuse or offense," the State offered Reyner's statement to police. The trial court found that, although Reyner had denied that the abuse took place, his statement of the afternoon's events was sufficiently similar to that of the child's to constitute "other corroborative evidence,"
[T]he defendant acknowledged taking a "nap" with the child and sharing a bed with the child. The defendant stated he and the child engaged in tickle type of play activity. The defendant stated he was wearing open fly boxer shorts and that on one occasion while he was asleep the child had wiggled under the covers and had snuggled next to him. The defendant acknowledged his penis could have been outside his shorts because of the open fly on the boxer shorts and his sleeping on his side. The defendant stated they fell asleep again and he woke up when the child had to go to the bathroom. They fell back asleep and were awoke [sic] by the defendant's wife. They tickle played again for a short period of time and then got up. This statement confirms the child's statement that she took a nap with the defendant, shared the same bed, they played with each other while the child was at the defendant's house, and she had the opportunity to be exposed to his penis.
Id. at 1073. Under these circumstances, the First District found no abuse of discretion in the trial court's ruling that Reyner's statement to police was sufficient to satisfy the corroboration requirement of section 90.803(23).
In Jones v. State, 728 So.2d 788 (Fla. 1st DCA 1999), the First District held that the other corroborative evidence need not even stem from the charged crime. There, the State charged Jones with lewd assault on a child, serving notice that it intended to offer both the child victim's hearsay statements and similar fact evidence at trial. The trial court first found that the similar fact evidence was admissible; then, the court found that the child victim's hearsay statements were admissible as the similar fact evidence could be used to satisfy the requirement of "other corroborative evidence of the abuse or offense." After these rulings, Jones pled no contest, reserving *192 the right to appeal the trial court's ruling regarding the admissibility of the hearsay statements. On appeal, Jones argued that similar fact evidence could never be used to satisfy the requirement of "other corroborative evidence of the abuse or offense" as, under the plain language of the statute, "`the corroboration must relate to the crime charged, not some other incident.'" 728 So.2d at 790 (emphasis in original). The panel first rejected Jones' contention that the rule of lenity required the court to construe any ambiguity in his favor, finding that the rule of lenity applies only to statutes that define criminal offenses and that section 90.803(23) is not such a statute. The court then held that similar fact evidence may be used to satisfy the requirement of "other corroborative evidence of the abuse or offense," relying on the fact that the supreme court had already held that similar fact evidence was admissible at trial to corroborate the testimony of a child victim in a sexual battery prosecution. See id. at 791 (citing State v. Rawls, 649 So.2d 1350 (Fla.1994)).
The common thread in all of these cases is that the other evidence tends to confirm the unlawful sexual act, i.e., the "abuse or offense." Here, the most that can be said is that the other evidence establishes that K.L. and the defendant were alone for a few moments in the supply room, i.e., that the defendant had the opportunity to commit the crime. None of the testimony presented at the hearing tends to confirm K.L.'s statements that the defendant touched her in an offensive manner; rather, only the innocent details of K.L.'s encounter with appellant are verified. Admitting K.L.'s hearsay statements under these circumstances is contrary to the very purpose of requiring "other corroborative evidence of the abuse or offense""assur[ing] that a defendant will not be convicted solely on the basis of the hearsay testimony." Townsend, 635 So.2d at 957. We hold that the trial judge abused his discretion in finding sufficient "other corroborative evidence of the abuse or offense" and in admitting K.L.'s hearsay statements at trial.
Since K.L.'s hearsay statements constituted the only evidence of the offense offered at trial, we reverse appellant's conviction and order that he be discharged.
REVERSED.
WARNER, C.J., and GUNTHER, J., concur.