777 So.2d 1153 (2001)
R.U., Appellant,
v.
DEPARTMENT OF CHILDREN & FAMILIES, Appellee.
No. 4D00-1586.
District Court of Appeal of Florida, Fourth District.
February 14, 2001.
*1154 Kristine M. Johnson of Kristine M. Johnson, P.A., Pembroke Pines, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and William M. Wittman, Assistant Attorney General, Fort Lauderdale, for appellee.
GROSS, J.
R.U. ("father") timely appeals an order granting the Department of Children and Families' dependency petition for R.U.'s daughter, K.U., whom the Department claimed was in danger of prospective abuse based on the father's alleged history of sexual abuse with K.U.'s half-sister, N.M. We reverse, holding that the trial court erroneously admitted into evidence the hearsay statements of N.M. to her counselor, since there was no "other corroborative evidence of the abuse or offense" within the meaning of section 90.803(23), Florida Statutes (2000).
On February 21, 1999, the Department placed K.U., a 2½ year old girl, into protective custody. In its affidavit and petition for placement, the Department alleged that K.U. was in danger of being neglected, abandoned, or abused because her mother was in a residential substance abuse program and her father had a prior history of sexual abuse toward K.U.'s half-sister, N.M. At the time of this petition regarding K.U., N.M. had been adjudicated dependent and the mother's parental rights as to N.M. were in the process of being terminated. By the time of the hearing in this case regarding K.U., N.M. was 8 ½ years old.
On July 22, 1999, the parties entered into a mediation agreement. The agreement provided that the mother would release her substance abuse treatment records to the Department for review, and *1155 would provide a certificate of completion from a residential treatment program. The agreement also required the father to participate in a "follow-up" evaluation with Dr. Sczechowicz and follow all treatment recommendations. The Department agreed that it would not use the results of the father's evaluation for any purpose except to show non-compliance with evaluation recommendations, but reserved the right to file a new petition if R.U. and K.U.'s mother failed to comply with the agreement provisions.
On November 29, 1999, the Department filed a motion for emergency judicial review because the father refused to undergo a full psycho-sexual evaluation. The father stated that he agreed to a "follow-up" session with Dr. Sczechowicz, rather than the 4-6 hour evaluation and polygraph test proposed by the Department.[1] The father had been subjected to a full psycho-sexual evaluation with Dr. Sczechowicz during the Department's earlier investigation of the allegations that the father had sexually abused N.M. At that time, the Department promised the father that it would take no further action if the father cooperated with the evaluation. The father felt that the Department did not keep its promise to drop the charges for the alleged abuse against N.M., and was reluctant to undergo another evaluation and take a lie detector test because of his mistrust of the Department.
However, the Department insisted on a full psycho-sexual evaluation for the father, including a polygraph exam. Communications between the Department and the parents broke down and the Department once again placed the child into protective custody. When the Department worker came to retrieve K.U., the father stated that he "will be coming after [the counselor]" if she did not take care of his child. He also said that he hoped the Department personnel "burned in hell" and that the counselor and her family "be strike [sic] with an infirmity and die." In a subsequent telephone conversation, the father called the counselor a liar and threatened to sue her for "committing a crime" by removing the child from the home.
On January 13, 2000, the trial court conducted a hearing on the petition for adjudication of dependency. The parties hotly contested whether statements the half-sister N.M. made to her counselor, Sonia Gallimore, could be admitted under the child victim hearsay exception of the Florida Evidence Code, section 90.802(23), Florida Statutes (2000). To determine whether the statements were admissible, the court heard the testimony of Gallimore, a marriage and family counselor who treated N.M. following her placement into protective custody.
Gallimore stated that N.M. "drew herself very sexy ... and then she told [Gallimore] how she wanted Mr. Hoover [her teacher]One day she got wet and she wanted Mr. Hoover to dry her like daddy dries her." When N.M. demonstrated how her "daddy" bathed her with a Barbie doll, Gallimore became concerned because the drying was not a "quick operation" the way "dads do bathe children and do dry their children," but one with too much "inappropriate" "tender caressing." Gallimore also testified:
The other statement relates to the magic carpet that up to as the last time I saw her, she said the magic carpet is a lovely secret and it's very nice. And she really missesshe wants a relationship with her dad because the magic carpet was so nice.
* * *

*1156 The magic carpet is that she lay on him and he keeps putting her up and down. He has onThe mother is in the bathroom, and they're alone in the room, and he tells her "It's our secret," and he puts her up and down, up and down. He has on his underpants. He took off his clothes and she took off her clothes except for the underpants and her panty. And she keeps talking about she wants a boyfriend and a husband, and they will do this magic carpet.[2]
Gallimore told the court that, during discussions about what N.M. would do with her boyfriend if he came over to her house, N.M. observed "[y]ou don't take off the pants until you're big. When the boy is big he goes to the bathroom and takes out his pee-pee."
Gallimore testified that the child demonstrated the magic carpet game with dolls, explaining that she "laid face-to-face" with the father and he would "lift her up and down, up and down." Gallimore said that the child also told her that she and the father "jokingly say to each other, `You must bow down to my butt hole.'"[3] When asked about the sleeping arrangements in the house, the child told Gallimore, "that she slept in the bed between her mother and [father]. [The father] slept in his underpants. Her mother slept nude. And she slept beside [the father]. And he would always hold her hands."
Gallimore also related statements from N.M. describing a scene of domestic violence between N.M.'s mother and the father:
[The father] threw her mother's jewelry down and the earring cut her mother's hand, and blood was coming out. And when she rushed to her mother, he told her to get a Band Aid. [The father] told her to leave her mother alone. And she said to him, "I don't have to listen to you." And she talks about him yelling and screaming and saying mean things to her.
However, Gallimore said that the child changed her story slightly the second time she discussed the domestic violence event, saying instead that the earring cut her mother's forehead. Gallimore also testified that N.M. later added elements to her story regarding the magic carpet game, saying that R.U. moved his pelvis in a circular fashion during the game.
During her testimony, Gallimore conceded that she had not treated N.M. since August 1999, several months before the hearing. However, Gallimore opined that it would be "devastating" to N.M. to have to testify about "secrets" she had with her therapist regarding her relationship with the father. Gallimore stated that, in order to get N.M. to respond truthfully to questioning at a trial, she would have to be manipulated and that such manipulation would be unethical.
Dr. Sczechowicz testified at the hearing as well, regarding the psycho-sexual evaluation of the father he performed in July 1996, after allegations of sexual abuse toward N.M. surfaced. Dr. Sczechowicz explained that, while psychological evaluations "are not instruments that will determine whether someone acted out sexually or not," he "didn't see anything" that would confirm the sexual abuse allegations. Dr. Sczechowicz explained that he did not perform a polygraph on R.U. at that time. However, the doctor testified that during a 1999 discussion about submitting to a polygraph, the father refused and became "irrationally angry." He noted that, although the 1996 evaluation did not show a risk indicator for sexual acting out, it did show a problem with anger control.
On February 17, 2000, the hearing on the petition for adjudication of dependency *1157 reconvened. In the time between the two hearings, Gallimore visited with N.M. for the first time since August, 1999. Gallimore testified that she spoke with N.M. about the dependency petition regarding her half-sister, K.U.:
A: Okay. In context was I asked her ifthat the court is trying to decide if [K.U.] should stay with mom and dad. What does she think they should do?
* * *
[N.M.] said "I don't want [K.U.] to live with them. I want her to live with me." I said "Well, that might not be possible." "Well, she can live with them."
And I said to her, "Well, if [R.U.] played the magic carpet with [K.U.], is that okay?"
She said "Yes."
So I gave her a doll. I said "Show me how you want to play the magic carpet with her."[]
And she said "He can bring [K.U.] on the bed, but he must bring her down on his stomach."
Defense counsel questioned Gallimore about the interview:
[R]ight after that these are your words, "The therapist challenged [N.M.] about how differently she showed the magic carpet."
And you stated to her ... "If I remember when you first told me, you told me you and [] [R.U.] had your clothes off, but never your panties off."
And [N.M.'s] response was, "I don't remember that."
She said that to you didn't she?
Gallimore replied "yes." She also testified that when she asked N.M. if she wanted to testify in court, the girl responded, "I'm shy." Based on her recent session with N.M., Gallimore concluded that she would not talk openly about the magic carpet game if required to testify, but stated "you can try."
At the February 17, 2000 hearing, Jesse Sanchez, a worker for the Department, also testified. Sanchez confirmed that the father refused to undergo a sex offender evaluation until he spoke with his attorney. Sanchez said that the father told her he believed that the agreement called for just one session, rather than a 4-6 hour evaluation and a lie detector test. She further recounted the father's angry behavior at the time K.U. was removed from the home. She noted that the father criticized the mother for cooperating with the Department. When asked how she formulated her risk assessment of the situation, Sanchez explained that she decided to remove K.U. from the house because the father refused to be evaluated, because the mother was no longer in therapy for her substance abuse but was, instead, only going to AA meetings, and because of the history of sexual abuse allegations regarding N.M.
At the end of the evidence, the trial court granted the mother's motion for dismissal of the petition to adjudicate K.U. dependent as to the mother. As to the father, the court admitted N.M.'s hearsay statements to counselor Gallimore under section 90.803(23), making many of the extensive factual findings required by that section of the evidence code.
On the merits of the Department's petition, the court found clear evidence that the father did not abide by his mediation agreement and was belligerent to Department workers. The court further ruled that the father's failure to cooperate with the Department, coupled with the court's concern about sexual activity, as suggested by N.M.'s statements to her counselor regarding the "secret" and the "magic carpet ride,"[4] were sufficient to show that K.U. *1158 was at risk. After the court determined that K.U. should be adjudicated dependent as to the father, the court reiterated its rationale for this ruling:
Well, listen. He failed to abide by the agreement. Okay? But I think that's where the hearsay may be appropriately placed to see is there any reason for him to have to comply with the agreement. And that's where the hearsay comes in that there is, because there was sufficient signs of some sexualinappropriate sexual activity by the father and child at a previous time that necessitated the agreement being complied with... His failure to comply with [the agreement] leaves the Court to have enough concern and that this child, the current child, is at risk for failure to set aside the concerns that would have been set aside had he complied with the agreement.
The court confirmed its findings in an April 5, 2000 written order adjudicating K.U. dependent as to her father.
Because it is dispositive of the case, we address only the father's contention that the half-sister N.M.'s statements to her therapist were erroneously admitted in evidence, because there was no "other corroborative evidence of the abuse or offense" within the meaning of section 90.803(23)(a)2.b., Florida Statutes (2000).
Section 90.803(23) is an exception to the hearsay rule codified at section 90.802, Florida Statutes (2000). Section 90.803(23) provides for the admission of hearsay statements from children under the "physical, mental, emotional, or developmental age of 11 or less" where the statement describes:
any act of child abuse or neglect, any act of sexual abuse against a child, the offense of child abuse, the offense of aggravated child abuse, or any offense involving an unlawful sexual act, contact, intrusion, or penetration performed in the presence of, with, by, or on the declarant child ...
§ 90.803(23)(a), Fla. Stat. (2000). The section further provides that the source of information and the method and circumstances by which the statement is reported must not "indicate [] a lack of trustworthiness." § 90.803(23)(a), Fla. Stat. (2000).
The hearsay exception requires the trial court to conduct a hearing to determine "that the time, content, and circumstances of the statement provide sufficient safeguards of reliability." § 90.803(23)(a)1., Fla. Stat. (2000). In making this determination,
the court may consider the mental and physical age and maturity of the child, the nature and duration of the abuse or offense, the relationship of the child to the offender, the reliability of the assertion, the reliability of the child victim, and any other factor deemed appropriate.
Id.
If the court rules that the hearsay statement is "reliable and from a trustworthy source," the court may admit the hearsay statement into evidence if the child *1159 declarant also testifies at trial, or if the child declarant is determined to be unavailable and there is "other corroborative evidence of the abuse or offense." State v. Townsend, 635 So.2d 949, 957 (Fla.1994); § 90.802(23)(a)2., Fla. Stat. (2000) (italics supplied). In addition to the indicia of unavailability provided for in section 90.804(1), a court may find a child to be unavailable to testify at trial if "the child's participation in the trial or proceeding would result in a substantial likelihood of severe emotional or mental harm." § 90.803(23)(a)2.b., Fla. Stat. (2000).
The "other corroborating evidence" requirement of section 90.803(23) "assures that a defendant will not be convicted solely on the basis of the hearsay testimony." Townsend, 635 So.2d at 957. In Ghelichkhani v. State, 765 So.2d 185, 190 (Fla. 4th DCA 2000), we defined the phrase "other corroborative evidence of the abuse or offense" as "`evidence other than the alleged child victim's out-of-court statements which tends to confirm that the charged offense occurred.'" Id. (quoting Jones v. State, 728 So.2d 788, 791 (Fla. 1st DCA 1999)).
In Ghelichkhani, we held that statements by three observers confirming innocent details of a child victim's encounter with the defendant were insufficient to corroborate the hearsay statements of the child victim, who told several family members that the defendant had "touched [her] pee-pee." 765 So.2d at 186. The state presented the testimony of the victim's mother and father, who testified that they saw their child exit an elevator with the defendant, holding some candy. See id. at 187. The victim's seven-year-old brother testified that the defendant took the victim into the supply room and the door shut behind them; when they came out of the room, the defendant held his sister's hand and his sister had gummy worms. See id. The state offered the family's testimony to corroborate the 2 ½ year-old victim's claim that the defendant had taken her to a supply closet and touched her vagina.
We held in Ghelichkhani that this testimonial evidence was not "other corroborative evidence of the abuse or offense" within the meaning of section 90.803(23):
Here, the most that can be said is that the other evidence establishes that [the child victim] and the defendant were alone for a few moments in the supply room, i.e., that the defendant had the opportunity to commit the crime. None of the testimony presented at the hearing tends to confirm [the victim's] statements that the defendant touched her in an offensive manner; rather, only the innocent details of [the victim]'s encounter with appellant are verified. Admitting [the victim]'s hearsay statements under these circumstances is contrary to the very purpose of requiring "other corroborative evidence of the abuse or offense""assur[ing] that a defendant will not be convicted solely on the basis of the hearsay testimony." Townsend, 635 So.2d at 957.
Ghelichkhani, 765 So.2d at 192 (italics supplied).
The "common thread" of the case law construing the corroboration requirement of section 90.803(23) is the corroborative evidence "tends to confirm the unlawful sexual act, i.e., the `abuse or offense.'" Id. Examples of proper corroboration are physical evidence of abuse, statements from the defendant himself, or similar fact evidence from a source other than the child victim. See Perez v. State, 536 So.2d 206, 210 (Fla.1988) (allowing defendant's admission to the police to be used as corroborative evidence); Zmijewski v. B'Nai Torah Congregation of Boca Raton, Inc., 639 So.2d 1022, 1026 (Fla. 4th DCA 1994) (stating that medical opinions that the child exhibited signs of sexual abuse were sufficient evidence to corroborate the child's hearsay statement); Reyner v. State, 745 So.2d 1071, 1073 (Fla. 1st DCA 1999) (allowing defendant's statements to the police to be used to corroborate details in the child's hearsay statements); Jones v. State, 728 So.2d 788, 791 (Fla. 1st DCA 1999) (allowing similar fact evidence of the *1160 defendant's other conduct to be used to corroborate the child's hearsay statements that abuse occurred).
Here, the only evidence being used to support N.M.'s hearsay statements is other hearsay statements made by the same child to the same therapist who testified as to the original declarations. The child declarant's hearsay statements cannot be "other" corroborating evidence within the meaning of section 90.803(23)(a)2.b. We read the word "other" in the rule as denoting evidence derived from a source other than the child victim's own statements.
Thus, we recently held that a psychologist's opinion that "something did occur" based on observed and reported behaviors did not amount to corroborative evidence under that rule. See Doe v. Broward County Sch. Bd., 744 So.2d 1068, 1071 (Fla. 4th DCA 1999) (refusing to admit hearsay statements where mother reported that victim was "agitated" and "very upset" following incident). Additionally, the counselor's subjective belief in the veracity of the hearsay statements cannot satisfy the "other" evidence requirement, since the witness may not vouch for the credibility of the child. See Tingle v. State, 536 So.2d 202, 204 (Fla.1988). Finally, the father's anger at and refusal to cooperate with the Department does not corroborate the sexual abuse, since such conduct is as consistent with one wrongfully accused as with a guilty mind. Because the trial court did not identify, and the record does not reveal, any evidence that could be used to corroborate N.M.'s statements that her father played a sexual game with her, the court erred in allowing N.M.'s statements to therapist Gallimore to be admitted under section 90.803(23).
We reverse the finding of dependency and remand for a new hearing.
DELL and KLEIN, JJ., concur.
NOTES
[1] At some point, it appears that R.U. agreed to the polygraph exam, because the record contains the results of a polygraph test conducted on April 12, 2000. That test indicated that the father admitted to playing a game called "magic carpet" with N.M., but denied having any sexual contact with the child. The polygraph administrator concluded that the father's responses were consistent with truthfulness.
[2] There was also discussion during the hearing about whether N.M. had a book about a magic carpet with her name in it that was special to her.
[3] There was some discussion about whether this statement is a reference to the Beavis and Butthead cartoons.
[4] In its written order, the trial court characterized K.U.'s out-of-court statements, in part, as follows:

a. The child's description of a "magic carpet" wherein she lies on [the father] like a "magic carpet" and he bathes her. The "magic carpet" has been described by the child as a "secret" that her mother did not know about and which occurred while the mother was in the bathroom. The child stated [the father] took off his shirt and pants and she takes off her dress and lays on top of him, face to face. The child continued to explain that [the father] lifts her up and down but that they never take their pants off. The child has also added that [the father] moved his pelvis in a circular fashion. In addition, the child stated "you don't take off your pants until you are big ... when the boy is big he goes to the bathroom and takes out his peepee" and when she is big, she "will follow him to the bathroom."
b. The child's statement "you must bow down to my butthole" could come from the television show "Beavis & Butthead", however, it could signify other concerns in this case.
c. The child's statement that [the father] is "fat as a pillow ... rides him like a magic carpet ... he bathes her" was the child's response during her first session when she was alone with her therapist and was asked to describe her family.